# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| **COMERICA BANK** | |
| *Plaintiff,* | |
| *v.* | Civil Action No. _____ |
| **CONSUMER FINANCIAL PROTECTION BUREAU** and **ROHIT CHOPRA**, in his official capacity as Director of the CFPB, | |
| *Defendants.* | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Matthew P. Previn (*pro hac vice* pending)
  matthewprevin@paulhastings.com
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (202) 318-6049

Jonice M. Gray (*pro hac vice* pending)
  jonicegray@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1781

Paul R. Genender (Texas Bar No. 00790758)
  paulgenender@paulhastings.com
PAUL HASTINGS LLP
2001 Ross Avenue, Suite #700-168
Dallas, Texas 75201
Telephone: (972) 936-7500

*Counsel for Plaintiff Comerica Bank*

Plaintiff Comerica Bank ("**Comerica**," the "**Bank**," or "**Plaintiff**") brings this action for declaratory relief against the Consumer Financial Protection Bureau ("**CFPB**" or the "**Bureau**") and Rohit Chopra, in his official capacity as Director of the CFPB, and allege as follows:

## INTRODUCTION

1.      Direct Express® is a program created and sponsored by the U.S. Department of the Treasury's Bureau of the Fiscal Service ("**Fiscal Service**") to provide recipients of federal benefits with consumer-friendly debit card accounts through which they can receive and use benefit payments.[1]

2.      Fiscal Service does not directly administer the full scope of the Direct Express program and instead relies on a financial institution to serve as a Financial Agent to the United States government to service the program pursuant to responsibilities delegated under the Financial Agency Agreement.

3.      Fiscal Service selects the Financial Agent through a competitive selection process in which financial institutions compete against one another and are judged on a number of factors, including, for example, experience and ability to comply with relevant laws and regulations.

4.      The competitive selection process was first conducted in 2008 and resulted in Fiscal Service selecting Comerica as the Financial Agent for the Direct Express program.  Fiscal Service again selected Comerica as Financial Agent for the program after subsequent competitive selection processes in 2014 and 2019.

5.      As a result of Fiscal Service's repeated selection of Comerica, the Bank has served as the servicer of the Direct Express program from its inception through the present.

---

[1] Direct Express is a service mark of the Fiscal Service. We omit the symbol designation for the remainder of this document.

6.     From inception, Fiscal Service has continued to exercise significant control over the development and operation of the Direct Express program and has exercised oversight over Comerica as the Financial Agent of the program.  This oversight has included the issuance of directives to Comerica related to the Bank's servicing of the program and regular communications regarding both general and day-to-day operation of the program.  Fiscal Service also requires the Bank to provide monthly reporting to Fiscal Service on key metrics related to the program.

7.     In all the years it oversaw Comerica's administration of the Direct Express program, Fiscal Service has never raised significant concerns regarding Comerica's administration of the program.  On the contrary, Fiscal Service repeatedly selected Comerica as Financial Agent for the program, including twice after Fiscal Service had first-hand knowledge of Comerica's performance administering the program.

8.     Nevertheless, beginning in 2021, the CFPB began pursuing an aggressive and overreaching investigation of Comerica ostensibly pursuant to its authority to enforce the Consumer Financial Protection Act (the "**CFPA**") and the Electronic Fund Transfer Act (the "**EFTA**").

9.     Throughout the investigation, the CFPB has failed to acknowledge that, as Financial Agent of the Direct Express program, Comerica generally acted with the oversight and knowledge or approval of the federal government—*i.e.*, Fiscal Service.

10.     In the course of its investigation, the CFPB has raised claims that are factually and legally flawed and that exceed its statutory authority under the CFPA and EFTA.

11.     In particular, the Bureau has claimed without justification that the Bank's customer-service practices, such as the length of time that customers may occasionally wait before reaching

3

a customer-service representative, are prohibited unfair, deceptive, or abusive acts or practices ("**UDAAPs**") under the CFPA.

12.     The Bureau has also claimed without justification that the Bank allegedly violated the CFPA by failing to establish adequate security controls to prevent and detect fraud resulting from account takeovers.  The CFPB advanced this argument even though it is EFTA—and not the CFPA—that provides the regulatory framework for addressing fraudulent transactions resulting from account takeover, and Comerica complied with its obligations under EFTA and implementing regulations.

13.     The Bureau's improper attempt to expand the scope of these statutes in an attempt to bolster its own powers has resulted in a constitutional violation because the CFPB failed to give Comerica fair notice that the Bank's alleged conduct fell under those respective statutes.

14.     Moreover, the CFPB has been functioning in an illegal and unconstitutional manner since 2022, because the Federal Reserve—on whom the Bureau's funding depends—does not have any "earnings," resulting in the Bureau operating under a funding structure that is unlawful under both the Appropriations Clause of the U.S. Constitution and the Dodd-Frank Act, the agency's authorizing statute.

15.     Comerica has nevertheless cooperated fully—and at great expense to itself—with the Bureau's legally questionable investigation.  Indeed, as part of this investigation, Comerica has spent millions of dollars, produced thousands of documents, and responded to hundreds, if not thousands, of different requests.

16.     With each passing day, Comerica continues to suffer substantial harm from the CFPB's ongoing and costly *ultra vires* investigation.  Faced with no other alternative to halt the Bureau's unremitting regulatory overreach, Comerica has filed this Complaint seeking a judgment

declaring that the CFPB's investigation is unlawful because it exceeds the scope of the CFPB's statutory authority under both the CFPA and EFTA. Comerica also seeks a judgment declaring that the Bureau's funding structure violates both the Constitution and the Dodd-Frank Act, and that the Bureau's regulatory overreach has effectively denied Comerica its constitutionally-protected due process rights.

## JURISDICTION AND VENUE

17.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States as well as the United States Constitution.

18.    This Court has authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and under its inherent equitable powers.

19.    Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(e)(1)(C), which permits Comerica to initiate an action against an agency of the United States in any district where "the plaintiff resides."

20.    Venue is also proper here because the defendant is an agency of the United States and "a substantial part of the events or omissions giving rise to the claim occurred" in the city of Dallas, Texas, located in Dallas County and within the Dallas Division of the United States District Court for the Northern District of Texas. 28 U.S.C. § 1391(e)(1)(B).

21.    Comerica is a financial services company that has been headquartered in Dallas, Texas since 2007. Its principal place of business is at the Comerica Bank Tower at 1717 Main Street, Dallas, Texas 75201, located in Dallas County and within the Dallas Division of the United States District Court for the Northern District of Texas.

22.    Comerica is chartered by the State of Texas and is supervised and regulated by the Texas Department of Banking under the Texas Finance Code.

**23.**     Comerica's senior leadership team is based in Dallas, and major corporate decisions pertaining to Comerica are made in Dallas.

## PARTIES

**24.**     Plaintiff Comerica Bank is a bank that is chartered by the State of Texas and which has its headquarters and principal place of business within the Dallas Division of the United States District Court for the Northern District of Texas.

**25.**     Defendant Consumer Financial Protection Bureau is a federal government agency of limited jurisdiction that, among other things, enforces certain claims under federal consumer finance laws.  *See* 12 U.S.C. § 5491(a).  The Bureau is located at 1700 G Street NW, Washington, District of Columbia 20552.

**26.**     Defendant Rohit Chopra, sued in his official capacity, is a natural person who currently serves as Director of the CFPB.

## FACTS

### A.     The Direct Express Program

**27.**     Direct Express is a program created and sponsored by Fiscal Service to facilitate compliance with the statutory requirement that non-tax federal payments be made by electronic fund transfer.  31 U.S.C. § 3332(f)(1).

**28.**     Recipients of federal financial benefits (*e.g.*, social security payments) can open a prepaid debit card account through the Direct Express program to receive and use benefit disbursements electronically.  The option of opening a Direct Express account is particularly beneficial to individuals who do not have a separate bank account where they could receive such funds electronically.

29.    Direct Express accounts feature a number of consumer-friendly benefits, including debit card access, no sign-up costs, no credit checks, no monthly or overdraft fees, and one free ATM cash withdrawal for each deposit posted to the account.

30.    More than 3.4 million Americans today receive federal benefit payments electronically to a Direct Express account maintained by Comerica.

**B.    Fiscal Service's Selection of Comerica to Service Direct Express**

31.    On a regular basis, Fiscal Service conducts a competitive selection process to choose a financial institution to serve as the Financial Agent responsible for servicing the Direct Express program, including issuing prepaid debit cards for and maintaining Direct Express accounts.

32.    Fiscal Service selected Comerica as Financial Agent of the Direct Express program after an initial competitive selection process in 2008.  Fiscal Service again selected Comerica as Financial Agent after competitive selection processes in 2014 and 2019.

33.    In each of these three instances, Fiscal Service chose Comerica to administer the Direct Express program over competing institutions.  In 2014 and 2019, Fiscal Service chose Comerica with the knowledge of Comerica's prior successful performance as Financial Agent.

34.    As a result of Fiscal Service's repeated selection of Comerica at the conclusion of its competitive selection processes, the Bank has served as Financial Agent for the Direct Express program from its inception in 2008 through the present.

**C.    Fiscal Service's Oversight of Comerica as Financial Agent of Direct Express**

35.    From the outset of the program, Fiscal Service has engaged in constant and extensive oversight of Comerica as the Financial Agent of Direct Express and has exercised significant control over the development and operation of the program.

36.     Comerica's administration of Direct Express is governed by a contract referred to as the Financial Agency Agreement ("**FAA**") that dictates Comerica's required services, compensation, and service level requirements ("**SLRs**"), among other key terms.  Comerica and Fiscal Service executed a new FAA each time Comerica won the competitive selection process to administer Direct Express.

37.     The FAA provides extensive avenues through which Fiscal Service exercises control over the operation of Direct Express and oversight of Comerica as the Financial Agent of the program.

38.     For example, Comerica regularly reports to Fiscal Service its performance under SLRs related to:

      **a.**     Accuracy of account setup and card issuance;

      **b.**     Issuance of replacement cards requested by accountholders;

      **c.**     Customer Service call wait times and call abandonment rates; and

      **d.**     Compliance with requirements under Regulation E, the implementing regulation for EFTA.

39.     According to the FAA, "SLRs are a means of setting a high standard for performance that translates to high quality service for federal benefit recipients."  Fiscal Service reviews Comerica's SLR performance on a monthly basis. The SLRs themselves are also reviewed by Fiscal Service and Comerica on a bi-annual basis, or more frequently, if warranted.

40.     As another example of Fiscal Service's oversight, Comerica is required under the FAA to engage an independent third party to conduct annually a customer service satisfaction survey.  Comerica is required to review the results of the annual survey with Fiscal Service and jointly to develop a plan of action to address customer service issues or concerns identified therein.

41.    In addition to its oversight activities, Fiscal Service exercises control of the operation of the Direct Express program through directives issued to Comerica.  Through these directives, Fiscal Service can require Comerica as Financial Agent to take specific actions or make adjustments to the operation of the program.

42.    Fiscal Service's involvement in the operation of Direct Express extends to the long-term development of the program as well.  For example, the FAA includes a list of projects on which Fiscal Service and Comerica must work to develop priorities and establish timelines.

43.    In addition to the oversight mechanisms outlined above, as well as others contained in the FAA, Comerica and Fiscal Service maintain constant communication regarding day-to-day and general operation of the Direct Express program.  Fiscal Service is either aware of, involved with the development of, or has expressly approved of, practically all aspects of Comerica's administration of Direct Express.

### D.    Comerica's Engagement of Third-Party Vendors

44.    With the approval of Fiscal Service, Comerica has utilized two third-party vendors to assist the Bank in the administration of Direct Express.

45.    Fiscal Service was deeply involved with the process through which Comerica selected and onboarded both vendors and issued directives instructing Comerica as Financial Agent to onboard each third-party vendor.  Fiscal Service has continued to oversee and monitor Comerica's use of both vendors.

46.    The two vendors provide services related to numerous aspects of the program, including card issuance, transaction processing, cardholder servicing (including customer service), dispute handling, and the provision of data for use on the website and mobile application.

47.    Comerica's engagement with each vendor is governed by a separate contract between Comerica and the vendor.  Similar to the FAA, these contracts include terms such as required services, compensation, and SLRs.

E.    **Comerica's Successful Performance as Financial Agent**

48.    Comerica's administration of the Direct Express program has generally met or exceeded the expectations set by Fiscal Service, achieved the program's purpose, and delivered impressive customer service despite the challenging attributes of the program and unpredictable intervening developments.

49.    Comerica's success as Financial Agent is evidenced by the fact that the Bank was selected as Financial Agent at the conclusion of three separate competitive selection processes conducted over an eleven-year span.

50.    Under Comerica's administration, the Direct Express program has delivered payments to more than 3.4 million cardholders who receive federal benefits since its inception.  A majority of these benefits recipients do not have a separate bank account and, therefore, would not be able to receive their benefits conveniently through electronic fund transfers if not for the Direct Express program.

51.    Overall cardholder satisfaction with Direct Express has been high.  The annual survey mandated by the FAA and conducted by an independent third party has consistently measured overall satisfaction by federal benefits recipients using the program at or above 90%.

52.    Comerica—in collaboration with Fiscal Service—has achieved these results despite the unique, and sometimes challenging, attributes of the program.  First among these attributes is the large size of the program's customer base, since the program covers over two dozen federal agencies.  Moreover, because deposits under the Direct Express program are made during a

concentrated disbursement period, inbound customer outreach about the program occurs at concentrated periods each month (at the time of deposits) rather than being spread more evenly throughout the month.

53.    The program's inherent challenges were exacerbated by the COVID-19 global pandemic, which brought customer-service labor shortages, an increase in funds being placed on cards due to economic-impact payments, and spikes in fraud as consumers relied more frequently on electronic means of payment and fraudulent schemes grew more sophisticated.

54.    To ensure effective and efficient administration of the program, Fiscal Service and Comerica coordinated closely to provide the necessary support to federal benefits recipients using the Direct Express program, and Fiscal Service was well aware throughout of the decisions Comerica made, and the methods it used, to administer the program.

**F.**    **The CFPB's Investigation of Comerica**

55.    Despite Fiscal Service's extensive oversight over and knowledge of Comerica's administration of the Direct Express program, and its repeated selection of Comerica as Financial Agent for the program following a competitive selection process, on July 14, 2021, the CFPB commenced an investigation of Comerica's administration of the program by issuing a Civil Investigative Demand ("**CID**") to Comerica.

56.    Since issuing the first CID, the CFPB issued several additional CIDs to Comerica and its employees.

57.    Despite the unreasonable volume of requests, Comerica diligently collected and provided the CFPB with the requested information and cooperated with the Bureau throughout its investigation.  In doing so, Comerica incurred significant legal fees and expended substantial resources.

11

58.     On September 18, 2023, the CFPB notified Comerica via letter and phone call that it was considering legal action against the Bank.  The Bureau provided this notification despite the fact that (1) Comerica had not completed production of information requested by the CFPB in accordance with a production scheduled agreed upon by the CFPB and the Bank, and (2) the Bureau issued another CID on September 25, 2023.

59.     According to the CFPB's September 18, 2023 letter, the Bureau was considering, among other things, bringing a claim that Comerica's customer service practices (including call wait times) in connection with the Direct Express program constituted an unfair or abusive act or practice in violation of the CFPA.

60.     On October 16, 2023, Comerica submitted a detailed response to the claims under consideration by the CFPB.  The response explained the factual and legal flaws in each of the claims that the CFPB was considering asserting against Comerica.

61.     Notwithstanding the Bank's October 16, 2023 submission, in May 2024, the CFPB informed Comerica that it intended to pursue a public enforcement action against Comerica based on practices that the CFPB alleges are unlawful under the CFPA and EFTA.

62.     Comerica has sought repeatedly to demonstrate to the CFPB that the Bureau's legal arguments are flawed and that the CFPB has no basis to bring an enforcement action against the Bank.

63.     Unfortunately, the Bureau continues to threaten an unjustified and unlawful enforcement action against Comerica under the CFPA and EFTA.  Seeing no reasonable alternative, the Bank has been forced to file this Complaint seeking declaratory and injunctive relief.

## STANDING

**64.**    Comerica has Article III standing to pursue the claims in this Complaint.

**65.**    "To establish Article III standing, a plaintiff must show" that it [1] "has suffered an 'injury in fact' that is [2] 'fairly traceable' to the defendant's conduct and [3] would likely be 'redressed by a favorable decision.'"  *Collins v. Yellen*, 594 U.S. 220, 242 (2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

**66.**    The CFPB's investigation, along with the looming threat of imminent civil litigation, has inflicted and will continue to inflict an injury-in-fact upon Comerica.  *See, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 211 (2020) (petitioner suffered a "concrete injury" because it was "compelled to comply with [a] civil investigative demand and to provide documents it would prefer to withhold").

**67.**    Because the CFPB's investigation is unlawful and has violated Comerica's constitutional rights, it inherently creates an immediate injury that is ripe for adjudication.  *Seila Law*, 591 U.S. at 212 (when a statutory provision governing the CFPB's structure violates the separation of powers, "it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court").

**68.**    Comerica's injuries are concrete and particularized.  Comerica has incurred millions of dollars in legal fees defending against the CFPB's illegal and unconstitutional investigation, produced millions of pages of documents to the government, and expended an enormous amount of time and resources defending against an investigation that both exceeds the CFPB's statutory authority and is unconstitutional.  This constitutes a "pocketbook injury" that "is a prototypical form of injury in fact."  *Collins*, 594 U.S. at 222; *see also Tex. Democratic Party v.*

*Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) ("[E]conomic injury is a quintessential injury upon which to base standing.").

69.     There is a causal connection between Comerica's injuries and the CFPB's conduct. All of the Bank's injuries are attributable to the CFPB and the CFPB's investigation.  If the CFPB had never initiated the investigation, Comerica would not have suffered the financial and reputational injuries discussed above.

70.     Plaintiffs' injuries in fact are redressable through this lawsuit.  This Court can and should declare that (1) the CFPB's ongoing investigation of Comerica and any enforcement action based on that investigation exceed the CFPB's UDAAP authority under the CFPA, (2) the CFPB's ongoing investigation of Comerica and any enforcement action based on that investigation exceed EFTA, and (3) the CFPB's actions against Comerica taken since 2022 are illegal and unconstitutional.  That relief would terminate injury to Comerica caused by an unlawful agency proceeding and would end the related injuries associated with the ongoing expense of that proceeding and any other similar proceedings or activities by the CFPB.

## CLAIMS FOR RELIEF

### Count 1 (Declaratory Relief):  the CFPB's investigation of, and threatened enforcement action against, Comerica exceed its statutory authority under the CFPA (Customer Service)

71.     Plaintiff incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

72.     The CFPB is an independent agency of limited jurisdiction with statutory enforcement authority over certain causes of action under certain statutes.

73.     Throughout the Bureau's investigation of Comerica, the CFPB has characterized alleged customer service deficiencies such as long call wait times as a violation of the CFPA's

prohibition on UDAAPs.

74.    Congress did not delegate to the CFPB unfettered discretion to declare any practice a UDAAP and thereby impose potentially crippling penalties for engaging in that putatively illegal practice. *See, e.g., Chamber of Commerce of U.S. of Am. v. CFPB*, 691 F. Supp. 3d 730, 740-43 (E.D. Tex. 2023) (rejecting the CFPB's attempt to declare discriminatory conduct a UDAAP under the CFPA).

75.    Comerica is aware of no case where a federal court has endorsed the application of the CFPA's prohibition on UDAAPs to reach customer service call wait times that are allegedly too long as a permissible exercise of the Bureau's statutory authority.

76.    The CFPB's attempt to characterize call wait times (and other customer service practices) as a "substantial injury" for the purposes of a putative unfairness claim under the CFPA is not a reasonable (or permissible) interpretation of the statute.

77.    In the absence of clear instruction from the legislature that this type of customer service practice is within the scope of the CFPA, the Court should prevent the CFPB from asserting a sweeping new construction of that statute here. *See, e.g.*, *West Virginia v. Environmental Protection Agency,* 597 U.S. 697, 723 (2022). A court "presume[s] that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *Id.* (citation omitted).

78.    Absent the Court's intervention, Comerica will continue to be subjected to the CFPB's illegal actions that exceed the Bureau's statutory authority.

79.    Accordingly, Comerica is entitled to a judgment under the Federal Declaratory Judgment Act and Federal Rule of Civil Procedure 57.

### Count 2 (Declaratory Relief): the CFPB's investigation of, and threatened enforcement action against, Comerica exceeds its statutory authority under the CFPA (Fraud Controls)

80.    Plaintiff incorporates by reference the allegations contained in all of the preceding

15

paragraphs as though fully set forth herein.

81.    The Bureau has threatened to bring an enforcement action against Comerica for a purported UDAAP violation based on the Bureau's (incorrect) belief that the Bank's security controls were inadequate because they failed to prevent and detect certain account takeover fraud resulting in unauthorized electronic fund transfers.

82.    The Bureau's theory of purported liability under the CFPA is inconsistent with EFTA.  Congress established in EFTA a "framework establishing the rights liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b).  The statute sets forth "a bank's responsibilities in helping to recover a customer's unauthorized electronic fund transfers and liability for losses."  *Holmes v. Cap. One, N.A.*, 2023 WL 6318883, at *7 (N.D.N.Y. Sept. 28, 2023). In implementing EFTA, the CFPB established through Regulation E conditions for liability and procedures for banks to resolve consumer's unauthorized electronic fund transfers, thereby acknowledging that unauthorized electronic fund transfers will occur and legally requiring banks to provide redress when they do.  12 C.F.R. §1005.6; 12 C.F.R.§ 1005.11.

83.    Apparently recognizing that Comerica has resolved consumer's unauthorized electronic fund transfers resulting from account takeover fraud by providing redress to affected consumers in compliance with EFTA and Regulation E and that the security controls Comerica has in place to detect unauthorized electronic fund transfers resulting from account takeover fraud are not unlawful under EFTA or Regulation E, the CFPB instead has sought to circumvent the comprehensive framework established by EFTA and Regulation E and rely instead on its authority to prohibit UDAAPs under the CFPA.

84.    It is well established that the obligations of a specific statute generally control over a more general statute, and "[t]hat is particularly true where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).  Thus, the obligations imposed by EFTA, as the more specific statute, should control over any obligations allegedly imposed by the CFPA, the more general statute.

85.    The CFPB's threatened enforcement action against Comerica would impose the strange legal circumstance that financial institutions can face penalties under the CFPA's UDAAP provision <u>even when that financial institution has complied fully with the unauthorized electronic fund transfer liability and resolution provisions of EFTA and Regulation E</u>.  There is no support for the Bureau's seeming belief that a bank can comply with its reimbursement obligations under EFTA and Regulation E while at the same time be in violation of the CFPA.

86.    The CFPB should not be allowed to circumvent the framework envisioned by EFTA with an enforcement action that is inconsistent with the governing statutory text.

87.    The CFPB likewise should not be permitted to use its enforcement powers to adopt its novel interpretations of the CFPA's UDAAP provisions and thereby "regulate by enforcement." Courts have not hesitated to foreclose attempts by the CFPB to take expansive action without expressly delegated congressional authority.  *See, e.g., Chamber of Commerce*, 691 F. Supp. 3d at 740-43 (the CFPB's attempt to regulate "discrimination" as a UDAAP under the CFPA exceeded its statutory authority where another federal statute, the Equal Credit Opportunity Act, set forth a specific framework prohibiting certain kinds of discrimination).  The CFPB's attempted power-grab contravenes the statutory limitations sets forth in the CFPA and EFTA.

88.     Accordingly, Plaintiff is entitled to a judgment under the Federal Declaratory Judgment Act and Federal Rule of Civil Procedure 57.

**Count 3 (Declaratory Relief): the CFPB's current funding method violates both the Appropriations Clause and the Dodd-Frank Act, and the CFPB therefore has no legal authority to initiate this enforcement action.**

89.     Plaintiff incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

90.     The CFPB's investigation of Comerica is both illegal and unconstitutional because the CFPB's funding mechanism violates both the Dodd-Frank Act, its authorizing statute, and the Appropriations Clause.

91.     The CFPB's "funding is . . . subject to the requirements of the Appropriations Clause," which requires that executive agencies be funded by "'Appropriations made by Law.'" *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (quoting U.S. Const. Art. I, § 9, cl. 7).

92.     The relevant "Law" providing funding for the CFPB is the Dodd-Frank Act, which, as the Supreme Court explained, "authorizes the [CFPB] to draw public funds from a particular source—'the combined *earnings* of the Federal Reserve System.'" *Id.* at 435 (quoting 12 U.S.C. §§ 5497(a)(1), (2)(A)–(B)) (emphasis added).

93.     Those "combined earnings" are "surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury." *Id.* at 425.

94.     Currently, however, there are *no* earnings of the Federal Reserve System upon which to draw because the Federal Reserve has not made a profit since 2022.  Rather, the Federal Reserve has been operating at a loss for the past two years.  *See* Federal Reserve, *Federal Reserve Board Releases Annual Audited Financial Statements*, Mar. 26, 2024, https://tinyurl.com/5xayzb38 ("**CFPB 2023 Press Release**") (indicating that the Federal Reserve

System's 2023 deficit was $114.3 billion); Federal Reserve, *Federal Reserve Board Releases Annual Audited Financial Statements*, Mar. 24, 2023, https://tinyurl.com/2xnjtywc ("**CFPB 2022 Press Release**") ("During 2022, the Reserve Banks . . . first suspended weekly remittances to the Treasury and began accumulating a deferred asset, which totaled $16.6 billion by the end of the year.").

95.    The CFPB is instead being funded from the Federal Reserve's *deficit*, which is not authorized by law.  *See* CFPB 2023 Press Release, https://tinyurl.com/5xayzb38 ("the Reserve Banks were assessed . . . $0.7 billion to fund the operations of the [CFPB]"); CFPB 2022 Press Release, https://tinyurl.com/2xnjtywc ("audited financial statements of the Reserve Banks" include "assessments of $2.8 billion for Board expenses, currency costs, and the [CFPB's] operations").

96.    As such, any action that the CFPB takes using such unappropriated funds—such as conducting an investigation against Comerica—is unlawful.

97.    Accordingly, Plaintiff is entitled to a judgment under the Federal Declaratory Judgment Act.

### Count 4 (Declaratory Relief): the CFPB's enforcement activity violates Comerica's constitutional due process rights.

98.    Comerica incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

99.    Constitutional due process requires Comerica to have fair notice that the CFPB would attempt to regulate certain categories of activities before Comerica engaged in them. Comerica cannot be expected to have "divine[d] the agency's interpretations in advance." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012).

100.     The CFPB's attempt to characterize certain customer-service practices as a UDAAP under the CFPA exceeds any reasonable interpretation of the statute.  The CFPB's threat to bring an enforcement action against Comerica founded in this new interpretation of UDAAP violates Comerica's due process rights because Comerica lacked fair notice that the CFPB would adopt such an expansive (and flawed) interpretation of the CFPA.

101.     The CFPB's attempt to characterize Comerica's alleged failure to establish requisite security controls to detect account takeovers as a UDAAP similarly exceeds any reasonable interpretation of the CFPA given that EFTA establishes a comprehensive "framework establishing the rights liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b).  The CFPB's threat to bring an enforcement action against Comerica founded in this new interpretation of UDAAP violates Comerica's due process rights because Comerica lacked fair notice that the CFPB would adopt such an expansive (and flawed) interpretation of the CFPA.

102.     Absent the Court's intervention, Comerica will continue to be subjected to the exercise of unconstitutional conduct by the CFPB.

103.     Accordingly, Comerica is entitled to a judgment under the Federal Declaratory Judgment Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Comerica Bank respectfully requests that the Court issue judgment in its favor and against Defendants and grant the following relief:

      a.    Declare that the CFPA's prohibition on UDAAPs does not permit the CFPB to set permissible customer service call wait times;

**b.** Declare that the CFPA's prohibition on UDAAPs does not permit the CFPB to render Comerica liable for failing to prevent and detect certain unauthorized electronic fund transfers resulting from account takeover fraud;

**c.** Declare that the CFPB has been operating unlawfully and unconstitutionally since 2022 by using unappropriated funds;

**d.** Declare that the CFPB has violated Comerica's due process rights by failing to provide fair notice of its new (and flawed) interpretation of the CFPA's UDAAP provisions.

**e.** Grant Comerica an award of the attorneys' fees, costs, and expenses incurred in connection with this action, as authorized by 28 U.S.C. § 2412; and

**f.** Award such other and further relief, at law or in equity, as is just and proper.

Dated:  November 8, 2024                    Respectfully submitted,


Matthew P. Previn (*pro hac vice* forthcoming)     Jonice M. Gray (*pro hac vice* pending)
  matthewprevin@paulhastings.com                 jonicegray@paulhastings.com
PAUL HASTINGS LLP                                  PAUL HASTINGS LLP
200 Park Avenue                                    2050 M Street NW
New York, NY 10166                                 Washington, DC 20036
Telephone: (212) 318-6049                          Telephone: (202) 551-1781


   */s/  Paul R. Genender*            

Paul R. Genender (Texas Bar No. 00790758)
  paulgenender@paulhastings.com
PAUL HASTINGS LLP
2001 Ross Avenue, Suite #700-168
Dallas, Texas 75201
Telephone: (972) 936-7500


*Counsel for Plaintiff Comerica Bank*